**Bowser v. Boguslawski**

C.P. of Armstrong County, no. 2001-0425-Civil.

*Alexander H. Lindsay Jr.,* for plaintiffs.
*Lee V. Price* and *Todd P. Prugar,* for defendants.

NICKLEACH, *P.J.,* December 22, 2005—This lawsuit by the parents of minor Tobias Bowser (Toby) alleges that Toby's fourth grade teacher, Charles Boguslawski, sexually molested Toby during the 1998-1999 school year at West Hills Elementary School, a school in the Armstrong School District, and that Boguslawski individually and the Armstrong County School District are liable for Boguslawski's actions. Before the court for disposition is defendant Armstrong County School District's motion for summary judgment.[1]

The complaint as originally filed contained five counts. Count I against Boguslawski alleged a violation of Toby's rights under 42 U.S.C. §1983. Count II alleged that the Armstrong County School District violated Toby's rights in contravention of section 1983. Count III against Boguslawski alleged that he committed assault and battery upon Toby. Count IV against the District also alleged assault, and Count V against the District alleged negligence.

The District filed preliminary objections in the nature of a demurrer with respect to Counts II, IV and V. By memorandum and order of August 16, 2002, this court denied the District's preliminary objections with respect to Count II and sustained the District's preliminary objections with respect to Counts IV and V, leaving the section 1983 claim the sole remaining count against the District.

---

1. Although the defendant's correct name is Armstrong School District, the court will use the name Armstrong County School District because that is the name under which the district has been sued.

## STATEMENT OF FACTS

The complaint alleges that Toby was sexually assaulted in his fourth grade classroom by Boguslawski during the 1998-1999 school year. It is the Bowsers' position that the District failed to take any measures to prevent Boguslawski from molesting Toby despite having prior knowledge that Boguslawski had previously molested other male students within the District. The Bowsers further allege that the District failed to adopt and implement a policy whereby acts of sexual abuse by its faculty would be discovered and reported to the proper authorities. The pertinent facts are as follows.

On the evening of March 29, 1999, Toby informed his mother that Boguslawski had molested him and a classmate, Cody Montgomery. After questioning Toby further, the next day the Bowsers contacted the state police and reported the alleged molestation. A state trooper went to West Hills that same day to interview Boguslawski, three girls who were students in his class, and two or three other teachers. Russell Carson depo. at 5-12. One of the girls said she observed Toby sitting on Boguslawski's lap and that Boguslawski's one hand was on Toby's stomach inside his shirt. *Id.* at 11-16. Another girl said she observed Toby sitting on Boguslawski's lap with Boguslawski's hand on Toby outside Toby's shirt. *Id.* Following a state police investigation, Boguslawski was criminally charged in connection with the incident. At trial, Boguslawski was acquitted of all charges and eventually returned to West Hills Elementary School to resume teaching there. *Id.* at 38-39.

As evidence that the District had prior knowledge that Boguslawski had previously molested male students, the

Bowsers offered the deposition testimony of Jay Toy. Toy testified that he had been a student of Boguslawski while attending Kittanning Township Elementary School in the mid-1970s. Toy stated that when he was in fifth or sixth grade, he saw Boguslawski molest classmates Randy Woznak, Matt Smith and Jeff Smith in his classroom. Toy Depo. at 6, 17-19, 22, 24-31. Specifically, Toy said, when one of these boys would raise his hand for help, Boguslawski would kneel down beside the student's desks, talk to the student, slide his hand up the person's leg, place his hand on the boy's genitals, and play with his penis and testicles. *Id.*

Toy said he reported this behavior to his mother, but not to anyone else. *Id.* at 17, 33-34. To his knowledge, his mother did not do anything but tell him to punch Boguslawski if he ever touched Toy. *Id.* at 19. Toy said the three students he observed being molested thought it was funny and would laugh about it. *Id.* at 19. Toy did not claim that he or anyone else ever informed the District of Boguslawski's alleged behavior at the time it occurred.

Toy said that at least eight or nine years ago, he was looking at a West Hills Elementary School yearbook while his children were attending school there. Looking at the yearbook, he discovered that Boguslawski was a teacher at that school. *Id.* at 14. Toy said he became angry that Boguslawski was still teaching and also was concerned that his son, Matt, might be assigned to Boguslawski's classroom the following year. Toy then went to the home of school secretary, Diane Bowser, a family friend, to talk to her about Boguslawski because he knew Diane was in charge of assigning children to teachers each school year at West Hills.

Toy said he told Diane in no uncertain terms that he did not want his boys assigned to Boguslawski's class because Boguslawski was a child molester, and that he would pull his boys out of school if any of them were assigned to Boguslawski's classroom. *Id.* at 13-14, 20-22. Toy said Diane, who had her own boy in Boguslawski's class that year, acted as if she didn't believe Toy, but agreed that Toy's son, Matt, would not be assigned to Boguslawski's classroom the next school year. *Id.* at 22-23. He admitted that he might have called Boguslawski a faggot during the conversation he had with Diane. *Id.* at 14.

Toy also admitted that he never told the police, the school or other parents that Boguslawski was a child molester. *Id.* at 21-23, 31-32. Asked if he was concerned that his two boys were still in the same building with a teacher he believed was a child molester, he said, "You know, this is probably going to be a stupid answer from a parent, but as long as my children didn't have him, it didn't bother me." *Id.* at 23. He gave essentially the same answer when asked why he never told anyone about the molestation he allegedly saw as a child prior to finding out that Boguslawski was teaching at West Hills Elementary, stating, "Just like whenever I was answering his questions, probably going to be stupid as a parent, I guess just long as my kids didn't have him I guess it didn't bother me." *Id.* at 33.

Diane Bowser testified that Toy told her he did not want his boys in Boguslawski's classroom because Boguslawski was gay or a faggot, although she could not remember the exact words Toy had used. Diane Bowser depo. at 8-13, 17. It is undisputed that Diane did not report her conversation with Toy concerning

Boguslawski to the building principal or to anyone else in the District. Diane Bowser depo. at 11. She explained her reasons for not reporting Toy's allegation as follows:

"Q. His thoughts, did he seem to be upset?

"A. Well, he just said—I just don't—he better not teach my kids, and I'll come in there, and I'll raise hell with the principal or whatever. Like I said, it was nine or 10 years. I don't know the exact words. I'm just kind of—I just know he didn't want them. So he didn't have him. He never told me names of those students.

"Q. What students?

"A. On that, on that report [Toy's signed statement to plaintiffs' attorneys] that he said Mr. Boguslawski inappropriately touched. He never told me names of students. He never told me he touched him, and in my mind, if he feels that he is gay, that's his opinion. I don't care. I don't care. You know, he did an excellent job. He was a friend of mine a friend at work, and I have never seen anything inappropriate, never. I never heard anything inappropriate about Mr. Boguslawski. And as a mother, as a parent if I thought there was anything that wasn't right, I would have taken—I would have went to the right person, and I definitely wouldn't have had my kid in his room, definitely.

"Q. You said you would have went to the right person?

"A. Well, I would have probably told the principal. If there was something inappropriate, I would have told the principal.

"Q. Did you tell him about the statements made by Jay Toy?

"A. Because it was just gay. It was just he was gay, and to me that's not my call to degrade someone's reputation. You know, you can be gay and be a teacher. You can be gay and be a doctor. This Jay Toy is a friend of ours, but he's a very prejudice [sic] person, and I know that he's prejudice about, you know, black and white, and so, I just thought, well, that's your thoughts, and if you want to think that, that's fine. You are an adult. You are allowed to think that. Like, I am. I have my thoughts, and your son won't have him, and that was it. It was that simple. To me it wasn't a big deal.

"Q. It apparently appeared to be a big deal to Mr. Toy, though, did it not?

"A. Just to say he didn't want him in there.

"Q. Have you had other parents come to you and state similar things about him being gay?

"A. No.

"Q. This is the only parent that ever told you that?

"A. From what I can remember. Like I said, this was nine or 10 years ago. And when you work in a school where that is your area, you run into parents constantly. They want to tell you their thoughts, whether you want to hear it or not. I mean, I used to sit and watch baseball games in my car, watch my boys play so I didn't have to sit out there and talk to parents. It's just part of the job. It's best to try and not get real involved with their personal thoughts. He didn't want him in there. So his kid wasn't in there.

"Q. This policy of not getting involved with their personal thoughts, is that your policy, or are you instructed to do that?

"A. Well, let's put it this way, I try and not get involved. Nobody ever told me that. It's just—I just think that's part of being a secretary working in a school. You don't want to get too involved because, then, I don't know. It's just—I just don't want to know everybody's business. If it has to do with school or their child, okay. Other than that, I really don't want to hear, you know, and he came to me about his son, and he was not in his room. So that was it." *Id.* at 10-12.

With respect to District training or policies concerning sexual harassment, Diane's testimony was as follows.

"Q. Do you recall at that period of time that is from approximately 1993 up to two years ago what the policy was concerning complaints about teacher misconduct, sexual misconduct of any kind? Was there any policy at West Hills? Do you understand my question?

"A. No, I don't.

"Q. Did you have any classes, training or anybody who said, listen, if someone brings up sexual misconduct, this is what you should do? Was there any guidelines?

"A. Well, probably in the past five years—I'm guessing, again, we have had in-services. Mostly it had to do with sexual harassment.

"Q. You mean sexual harassment from adults male/ female, female/male?

"A. I think, yeah.

"Q. Was there any training that you recall where there was ever any discussion about this type of conduct where you had an adult teacher with a child? Do you recall any training along those lines?

"A. No, I don't. I think the sexual harassment was pretty much it. I think it was with another adult. I don't know." Diane Bowser depo. at 13-14.

Russell Carson, the principal of West Hills Elementary School from 1996 until 2003, testified as follows concerning school policy:

"A. I don't believe a teacher or any educational person should be touching children in any manner.

"Q. Okay. Have you ever suggested that to your teachers?

"A. Yes.

"Q. When?

"A. The District has a sexual harassment policy for one instance that we do go over yearly, as an administrator that I do go over yearly with the staff. And that covers a wide range of not just teacher to student but teacher to teacher, administrator to teacher, covers pretty much everyone. That any type of sexual misconduct is not appropriate and that it can be reported and steps of how it will be investigated.

"Q. Okay, if a boy was, as this one girl suggested, was a fourth grade boy I believe sitting on Mr. Boguslawski's lap and his hand was up his shirt, you're saying no question in your mind, that's not right, that's inappropriate?

"A. I would use the word inappropriate, yes.

"Q. And which would have required discipline; is that correct?

"A. Absolutely." Carson depo. at 16-17.

Asked to explain why he believed the contact described by the girls was inappropriate, he said, "I don't believe a

teacher or any educational person should be touching children in any manner." *Id.* at 16. During a further exchange regarding school policy on sexual misconduct, Carson testified as follows:

"Q. Okay. And there is a clear reporting policy?

"A. Yes.

"Q. Who would it have been reported to if somebody had observed this or heard a student complain about it or whatever? Who do they go to?

"A. At West Hills at that time they would have come to me first." *Id.* at 22.

Asked what he would do if a student or parent came to him with a complaint of improper contact, he explained:

"A. Well, then, as the building principal, I would investigate the complaint naturally.

"Q. How would you do that?

"A. Naturally you would interview, for instance if it was a student making this complaint, you would want to interview the student making this complaint, you would want to interview the student to find out what they're saying. You would probably want to interview the student's parents because they would probably also be aware of the situation. Hopefully the child had told the parents. You would want to speak to the person the complaint is made against. In this case, it would have been a teacher. And probably the teachers around, you know, that would be working most closely with that teacher. Probably if in that investigation, if there were other names given of students or any other witnesses, you would want to speak to all the witnesses, try to get a comprehensive idea of what did or didn't happen.

"Q. Okay. At any point in this scenario, would this be turned over to law enforcement?

"A. It's possible.

"Q. If there was an allegation of criminal misconduct?

"A. If, if I was—if the allegation lent itself to that, yes." *Id.* at 22-24.

Carson admitted that he never conducted an investigation of the charges against Boguslawski, either before or after the criminal investigation and trial, despite the fact that his normal procedure would be to investigate any molestation charges by questioning the alleged victim, the teacher, and any other potential witnesses. He said this was because no one had asked him to investigate (the Bowsers had gone directly to the state police with their charges), he was present for the state police's interviews of witnesses at school, he did not want to interfere with the ongoing criminal investigation, and Boguslawski was ultimately acquitted. *Id.* at 23-38. He also admitted that Boguslawski eventually returned to the school to teach, despite having engaged in what Carson considered inappropriate touching. *Id.* at 38-39.

Sharon Porterfield, another fourth grade teacher at West Hills Elementary School at the time, explained the school policy regarding inappropriate physical contact as follows:

"Q. Do you know if Armstrong County School District has any policy with regard to physical contact between teachers and students? Let me change the question. As of March of 1999, prior to that date, were you aware of a policy in effect with regard to what was appropriate and inappropriate for a teacher to do with regard to touching?

"A. We talked about this at the beginning of every school year. We would go over a booklet about sexual harassment with the principal, you know, basically.

"Q. Who told you this?

"A. Mr. Carson would review the sexual harassment handbook with us at in-service day every year, at the beginning of the year.

"Q. What do you remember about it?

"A. Just to report any type of inappropriate touching that's either reported to you or that happens to you basically, that you know, children are not allowed to inappropriately touch children, you know. You are to report anything. And basically, the only thing that changed from year to year was who the person was you needed to report things to.

"Q. All right. Who were you to report sexual harassment things to?

"A. To the principal first.

"Q. Okay.

"A. And then to, it was a person who was in charge of human relations. You know. You reported to your principal first and then to the human relations person.

"Q. So you were to report it as soon as you became aware of it?

"A. Yes.

"Q. Okay. And inappropriate touching was? Can you be more specific what you were told that was?

"A. Well, I pretty much, you know, like sometimes when things would happen with the children, you would

go and consult your principal and say, is this inappropriate touching or is this inappropriate suggestive language from this child to this child. I'm telling you, you know, what I overheard or what I saw. Is this inappropriate? Do I need to make a report about this? You know. That type of thing. You would definitely have checked it out with your principal if you were doing your job." Porterfield depo. at 38-39.

## DISCUSSION

We next turn to a consideration of the law in this case. Summary judgment is appropriate where, after the close of discovery, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action. Pa.R.C.P. 1035.2(2). Summary judgment is only proper when the moving party can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Buckno v. Penn Linen & Uniform Service Inc.,* 428 Pa. Super. 563, 631 A.2d 674 (1993). Where more than one conclusion can be drawn from the facts, summary judgment is likewise inappropriate. *Askew by Askew v. Zeller,* 361 Pa. Super. 35, 521 A.2d 459 (1987). The record must be reviewed in a light most favorable to the non-moving party and if any doubt exists as to the existence of a genuine issue of material fact, it must be resolved against the moving party. *Hayward v. Medical Center of Beaver County,* 530 Pa. 320, 608 A.2d 1040 (1992). The burden is on the party moving for summary judgment to prove the non-existence of any genuine issue of material fact. *Lyman v. Boonin,* 535 Pa. 397, 635 A.2d 1029 (1993).

Section 1983 states in pertinent part:

"Every person who, *under color of any* statute, ordinance, regulation, *custom, or usage,* of any State or Territory . . . , *subjects, or causes to be subjected, any citizen* of the United States *or other person* within the jurisdiction thereof *to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,* shall be liable to the party injured in an action at law . . . ." 42 U.S.C. §1983. (emphasis added)

When a section 1983 claim is asserted against a governmental entity, a two-prong analysis is required. The court must ascertain (1) whether the plaintiff's harm was a constitutional violation, and (2) if so, whether the governmental entity is responsible for that violation. *Collins v. Harker Heights,* 503 U.S. 115, 120 (1992). For liability to attach, both questions must be answered in the affirmative.

In this case, it is clear the sexual molestation claimed to have been suffered by Toby Bowser, if proven, would constitute a constitutional violation. "[A] schoolchild's right to personal security and to bodily integrity manifestly embraces the right to be free from sexual abuse at the hands of a public school employee. The substantive component of the Due Process Clause [of the Fourteenth Amendment] protects students against abusive governmental power as exercised by a school." *Doe v. Claiborne County, Tennessee,* 103 F.3d 495, 506-507 (6th Cir. 1996). See *Stoneking v. Bradford Area School District,* 882 F.2d 720, 726 (3d Cir. 1989), *cert. denied,* 493 U.S. 1044 (1990). Having answered the first question in the affirmative, we will proceed to the question of whether the District can be held responsible for that constitutional violation under the facts of record.

The general standard for holding a governmental entity liable under section 1983 is as follows:

"[A] local government may not be sued under section 1983 for an injury inflicted solely by its employees or agents. Instead, *it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,* inflicts the injury that the government as an entity is responsible under section 1983." *Monell v. New York Dept. of Social Services,* 436 U.S. 658, 694 (1978). (emphasis added)

As the Supreme Court explained in *Monell:*

"Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tort-feasor—or, in other words, a municipality cannot be held liable under section 1983 on a *respondeat superior* theory." *Id.* at 691.

In *Gottlieb v. Laurel Highlands School District,* 272 F.3d 168 (3d Cir. 2001), the Third Circuit Court of Appeals stated:

"We have recognized that a municipality will be liable for the constitutional violations of a state actor if it acts with deliberate indifference to the consequences [and] established and maintained a policy, practice or custom which directly caused constitutional harm. . . . *This causal connection can be established by alleging 'that policymakers were aware of similar conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their*

*injury.*' " *Id.* at 175-76. (citations omitted) (emphasis added)

In the instant case, plaintiffs allege that the District failed to take any measures to prevent Boguslawski from molesting Toby despite the District's knowledge that such acts had been perpetrated by Boguslawski on other male students. For purposes of deciding whether summary judgment should be granted, the court must view the evidence in the light most favorable to the plaintiffs. The court finds that Toy's testimony, if accepted as credible at trial, would be sufficient to establish that at least eight or nine years ago (*i.e.,* around 1996 or 1997), Toy informed the school secretary at West Hills that Boguslawski was a child molester. The question is (1) whether that conversation, by itself, could legally be considered actual knowledge on the part of the District that Boguslawski was a child molester, and (2) whether plaintiffs have produced evidence sufficient to create a genuine material issue of fact concerning the Bowsers' claim that there was a District custom, practice or policy of deliberate indifference to sexual misconduct by teachers with students.

Plaintiffs claim it is a jury question as to whether Toy's statement to Diane Bowser that Boguslawski was a child molester was sufficient to put the District on notice that male students were in substantial danger of being molested. The court does not agree. For the District to be liable under section 1983, the plaintiffs must show that an appropriate person at the school had actual knowledge of the conduct in question. Assuming that Toy told Diane Bowser in 1996 or 1997 that Boguslawski was a child molester, it is clear from relevant caselaw that her knowledge could not be imputed to the District.

In *Johnson v. Elk Lake School District,* 283 F.3d 138 (3d Cir. 2002), a former student sued the high school guidance counselor, school district, school board and school superintendent under section 1983, claiming that a school counselor had sexually harassed and abused her for over two years. The district court granted summary judgment for the district, board and superintendent, concluding that the plaintiff had produced no evidence that the counselor's supervisors had any knowledge of any danger of abuse at a time when they could have acted to prevent the plaintiff's injuries.

On appeal, the Third Circuit affirmed the grant of summary judgment. The court said that any comment allegedly made to a high school counselor of "something funny" going on between a student and another counselor, without evidence of any specific mention of sexual harassment or abuse, did not put the counselor to whom the comment was allegedly made on notice as to an ongoing constitutional violation by the other counselor. *Id.* at 145 n.1.

The court went on to explain that even if the comment did put the counselor on notice, *this conversation would still fail to establish section 1983 liability on the part of the school district, board and superintendent, since a guidance counselor does not qualify as the type of policymaking or supervisory official on account of whose inaction a municipality may be held liable under section 1983. Id.* For that reason, the plaintiff had "failed to establish, as she must under . . . *Monell* . . . that her injuries were caused by a 'policy or custom' of the administration." *Id.* Because there was no credible evidence demonstrating that school officials knew of the alleged risk of sexual abuse at a time at which they could have pre-

vented the alleged injuries, the court ruled that the district, board and superintendent could not be held liable under section 1983. *Id.*

The court went on to address the plaintiff's contention that even if the school administration had not been aware of the counselor's abuse of the plaintiff, it could be held liable "for failing to respond to the danger posed by Steven's well-known proclivity for sexually harassing and abusing female students." *Id.* "In other words, . . . [plaintiff was] attempt[ing] to demonstrate that the administration had a custom of being deliberately indifferent to . . . [the counselor's] potential for committing constitutional violations, and that this 'deliberate indifference' was the proximate cause of the injuries she sustained." *Id.*

The court said even if it were true that the counselor had a proclivity for walking too closely to female students in the hallway, frequently calling female students out of class to his office, and giving gifts to female students, the district, board and superintendent were not liable absent evidence that these alleged incidents were ever brought to the attention of a supervisory or policy-making official of the administration before or during the time of the alleged abuse of the plaintiff. *Id.* The court went on to say:

"Moreover, even if school officials had been made aware of these stories before or during Steven's alleged improper relationship with Johnson, we share the district court's reluctance 'to impose on the district an obligation to treat as true, all rumors, until proven otherwise.' In the absence of any direct complaints made to school officials, the mere floating around of unsubstantiated

rumors regarding a particular employee—particularly in the high school setting, which is notoriously rife with adolescent gossip—does not constitute the kind of notice for which a school district can be held liable under *Monell's* 'policy or custom' requirement." *Id.*

Based on the above reasoning, the circuit court affirmed the district court's granting of summary judgment in favor of the district.

*Johnson* is clearly dispositive here. The plaintiffs have failed to produce any competent evidence that the District was aware of similar conduct by Boguslawski in the past but failed to take precautions against future violations. To the contrary, the evidence shows that the District had no prior complaints concerning Boguslawski's having improperly touched students. Nor have plaintiffs adduced any evidence which tends to show that the District had a custom of ignoring such complaints or that any such custom was the cause of Toby's alleged injury. Cf. *Stoneking,* 882 F.2d at 728-29, 730-31 (evidence that over a four-year period high school principal and assistant principal received at least five complaints about sexual assaults of female students by teachers and staff, that principal recorded these and other allegations in a secret file at home rather than in the teacher's personnel files, that the defendants gave the offending teachers excellent performance evaluations, and that the principal and vice-principal discouraged and/or intimidated students and parents from pursuing complaints, on one occasion by forcing a student to publicly recant her allegation, presented sufficient evidence to overcome qualified immunity defense by principal and assistant principal against charges that they had a custom or practice of tolerating, condoning or encouraging sexual harassment).

The plaintiffs also argue that the District gave inadequate training on reporting allegations of improper physical contact. Specifically, they point to Diane's failure to report Toy's conversation concerning Boguslawski in the mid-1990s to the building principal as evidence that the training of the school staff regarding reporting was inadequate. In addition, they claim that Diane's vagueness about the details of the harassment policy and the supposedly different versions of the policy given by Carson and Porterfield further highlights the inadequacy of the training given the school staff.

In *City of Canton v. Harris,* 489 U.S. 378 (1989), the idea of policy or custom was expanded to include inadequacy of training. The Supreme Court explained:

**"Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under section 1983.** As Justice Brennan's opinion in *Pembaur v. Cincinnatti,* 475 U.S. 469, 483-484, 106 S.Ct. 1292, 1300-1301, 89 L.Ed.2d 452 (1986) (plurality) put it: 'Municipal liability under section 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers. See also, *Oklahoma City v. Tuttle,* 471 U.S., at 823, 105 S.Ct., at 2436 (opinion of Rehnquist, J.). Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under section 1983." *Id.* at 389. (bold emphasis added)

The court went on to say:

"*Monell's* rule that a city is not liable under section 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.' It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in the light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.* at 389-90.

Plaintiffs have failed to produce any evidence of improper training sufficient to demonstrate a custom of being deliberately indifferent to the rights of students to be free from improper physical contact by teachers. The undisputed evidence shows that the District had a policy concerning sexual harassment and the reporting of any improper contact in place, and that teachers and staff were briefed on that policy at the beginning of every year. Evidence that not all District employees might not have completely understood or followed the policy does not

suffice to create a genuine issue of material fact regarding improper training, nor does the fact that Diane Bowser chose not to report Toy's allegation that Boguslawski was a child molester. As the deposition testimony makes clear, regardless of the exact words Toy used, his intent was simply to keep his children out of Boguslawski's class. He did not express any concern for the other children in Boguslawski's class or even have any concern about having his children in the same building with Boguslawski. Given this, Diane Bowser's explanation of how parents frequently came to her with various opinions and requests about teachers, and her belief that Toy was simply prejudiced against gays, Diane's decision not to report Boguslawski's remarks was not unreasonable. Diane's failure to report Toy's concern certainly does not create a genuine issue of material fact concerning the existence of inadequate training that rises to the level of "deliberate indifference" on the part of the District to charges of sexual harassment.

For all the above reasons, the court finds that the District has met its burden of showing that there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law. Therefore, the court will grant the District's motion for summary judgment.

An appropriate order will be entered.

## ORDER

And now, to wit, December 22, 2005, after due consideration of defendant Armstrong County School District's motion for summary judgment, it is ordered, adjudged and decreed that summary judgment against plaintiffs and in favor of defendant Armstrong County School District be and is hereby granted.